A10A1934. GIACOMANTONIO et al. v. ROMAGNOLI et al.

(701 SE2d 510)

BLACKBURN, Senior Appellate Judge.

This case involves a "corporate divorce" between appellants Mirko Di Giacomantonio and Rosa, Inc. and appellees Sandro Romagnoli, The Emilio Civeli Group, Inc., Irven Penn, L. J. Hooker Corporation (Worldwide), Inc., and IB Penn, Ltd. Giacomantonio and Rosa appeal from two different orders entered by the trial court. The first order granted summary judgment in favor of appellees on Giacomantonio and Rosa's tort claims against them, based on the trial court's finding that the involuntary withdrawal provisions contained in the contracts at issue were enforceable against Giacomantonio and Rosa. The second order entered final judgment in favor of Giacomantonio and Rosa in the amount of $370,129.90, and provided that such sum was payable to them over a period of ten years.

On appeal, Giacomantonio and Rosa claim that the trial court erred: (1) in denying their motion for a temporary injunction granting Giacomantonio 50 percent of the voting rights in the companies he co-owned with Romagnoli and Penn or alternatively, to appoint a receiver to manage those companies and conduct an accounting; (2) in holding that because the involuntary withdrawal provisions were enforceable against Giacomantonio, he was precluded from asserting tort claims for fraud and breach of fiduciary duty; and (3) in failing to award Giacomantonio and Rosa a one-time lump sum payment, rather than allowing that sum to be paid out over a ten-year period. Discerning no error, we affirm.

The grant or denial of a motion seeking either a temporary injunction or the appointment of a receiver will not be interfered with by this Court in the absence of a manifest abuse of discretion. *Cherokee County v. City of Holly Springs*[1] (injunctive relief); *Fulp v. Holt*[2] (appointment of a receiver). We apply a de novo standard of review "to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant."

---

[1] *Cherokee County v. City of Holly Springs*, 284 Ga. 298, 301 (2) (667 SE2d 78) (2008).

[2] *Fulp v. Holt*, 284 Ga. 751, 752 (670 SE2d 785) (2008).

*Donchi, Inc. v. Robdol, LLC.*[3]

The undisputed record shows that Giacomantonio and Romagnoli[4] formed three companies in 2001 and 2003: Companies 1 and 2 operated restaurants, and Company 3 supplied the restaurants with food and equipment.[5] The voting rights of the three companies were divided equally between Giacomantonio and Romagnoli whereas the ownership rights were divided unequally between Giacomantonio, Romagnoli, and Irven Penn, an attorney who served as general counsel for the companies.[6]

During 2003, Giacomantonio began divorce proceedings from his first wife. He was represented during that divorce by a succession of attorneys, not including Penn. He often consulted with his attorneys and with Penn and Romagnoli about the issue of his wife's potential interest in the three companies. He eventually agreed that his financial situation justified his being involuntarily withdrawn from the three companies, which precluded his participating as an interest holder in the companies; however, the companies did loan him money to fund his child support and custody-related expenses. He then sold his interests in Companies 2 and 3 to Romagnoli and Penn, who in turn formed additional companies (owned solely by themselves) to run more new restaurants.[7]

With regard to the transactional documents effecting his withdrawal and loans from the companies, Giacomantonio testified that he did not read the documents before he signed them, although no one had prevented him from reading the same. He explained that Penn told him each of the documents was part of Penn's "divorce strategy" — i.e., a way to keep Giacomantonio's first wife from gaining any ownership interest in Companies 2 and 3.

The final judgment and decree in Giacomantonio's divorce (entered on February 28, 2005) incorporated a settlement agreement

---

[3] *Donchi, Inc. v. Robdol, LLC*, 283 Ga. App. 161, 161 (640 SE2d 719) (2007).

[4] Giacomantonio owned his interest through the corporation Rosa, Inc., while Romagnoli held his interest through the corporation The Emilio Civeli Group, Inc. For purposes of this opinion, Giacomantonio and Rosa, Inc. are referred to collectively as "Giacomantonio"; Romagnoli and The Emilio Civeli Group, Inc. are referred to collectively as "Romagnoli."

[5] In January 2001, the parties formed Figo Pasta, LLC (Company 1) to own and operate the first Figo Pasta Restaurant, located on Collier Road in Atlanta. On January 1, 2003, they created Certo, LLC (Company 2) for the purpose of owning and operating Osteria Del Figo restaurant. In May 2003, the parties formed Spiga, LLC (Company 3) to own and operate a central commissary that would supply both Figo Pasta and Osteria Del Figo.

[6] Penn held his ownership interest through his wholly-owned corporation L. J. Hooker Corporation (Worldwide), Inc. Penn, L. J. Hooker, and IB Penn, Ltd. (another corporation wholly owned by Penn) are referred to herein collectively as "Penn."

[7] Specifically, Romagnoli and Penn formed Torce, LLC to own and operate the Figo Pasta location in Decatur; formed Taparo, LLC to own and operate the Figo Pasta location in the Edgewood neighborhood; and formed IDA Atlanta, LLC to own and operate the Figo Pasta location in the Virginia-Highland neighborhood.

between Giacomantonio and his wife. That agreement provided in relevant part:

> Husband specifically and unequivocally represents and warrants that he possesses no ownership interest, claim, right, option or the like in [Companies 2 and 3] or any other entity [other than a 47.5 percent interest in Company 1]. Notwithstanding anything to the contrary above, Husband agrees that, should he acquire (by purchase, gift, transfer, or any other mechanism) any ownership interest whatsoever in [Companies 2 or 3] within three (3) years of entry of the Final Judgment and Decree of Divorce, the wife shall be entitled to an equitable claim to one-half of said interest.

In early 2007, the parties restructured the ownership of several restaurants and Companies 2 and 3 so that all the entities were owned by one of three new LLCs. Pursuant to three separate operating agreements executed by Giacomantonio, Romagnoli, and Penn on March 1, 2007, the restaurants became owned by LLC No. 1;[8] Company 2 became owned by LLC No. 2;[9] and Company 3 became owned by LLC No. 3.[10] Under the terms of the LLC operating agreements, Giacomantonio and Romagnoli each held 47.5 percent of the ownership and voting rights in each entity, with Penn holding the remaining 5 percent. All three operating agreements provided that a member could be involuntarily withdrawn from the LLC in the event that a "final order of a court in a divorce proceeding, not subject to appeal, is entered," which required the member to "transfer all or part of his" interest in the company to his spouse or former spouse. Each operating agreement also contained a merger clause, which provided that the agreement "constitute[d] the complete and exclusive statement of the agreement among the members" and that it "supercede[d] all prior oral and written statements, including any prior representation, statement, condition, or warranty."

Giacomantonio testified that he paid no money in exchange for his ownership interest in the three new LLCs. He further stated that he received the operating agreements several days before he signed them; that he attempted to read the documents; and that he discussed them with the same attorney that had finalized his divorce settlement. Giacomantonio also testified that Penn had prepared all

---

[8] Flusso, LLC.
[9] Figo Pasta A, LLC.
[10] Figo Pasta B, LLC.

the documents, that he viewed Penn as his personal attorney, and that he had paid Penn for his legal services, as evidenced by the fact that Penn had received an ownership interest in each of the companies.

In April 2007, Romagnoli and Penn notified Giacomantonio that he had triggered an involuntary withdrawal from the three LLCs. The involuntary withdrawal was premised on the fact that Giacomantonio's divorce decree entitled his ex-wife to part of his ownership interest in LLC Nos. 2 and 3, in that the operating agreements transferred to Giacomantonio an ownership interest in both Companies 2 and 3 only two years after the entry of the divorce judgment.

Giacomantonio then initiated the current action, alleging that the involuntary withdrawal provisions were not enforceable against him because Romagnoli and Penn had fraudulently represented to him that (1) the LLC operating agreements granted him 50 percent of the voting rights in each of three LLCs; and (2) the provision in his divorce decree that would entitle his ex-wife to any part of his ownership interest in Companies 2 and 3 expired two years after it was entered, rather than three. Giacomantonio therefore sought a preliminary injunction granting him a 50 percent voting interest in the new LLCs or, alternatively, the appointment of a receiver to manage the affairs of the new LLCs. He also asserted claims for fraud, negligent misrepresentation, civil conspiracy, breach of fiduciary duty, and breach of contract. Giacomantonio did not seek to rescind the operating agreements.

The trial court denied Giacomantonio's motion for injunctive relief or, alternatively, the appointment of a receiver, finding that Giacomantonio had failed to establish that he had no adequate remedies at law and that he had put forth no evidence of fraud, waste, abuse, or mismanagement of the new LLCs. Romagnoli and Penn thereafter moved for summary judgment, arguing that the involuntary withdrawal provisions were enforceable against Giacomantonio, and that Giacomantonio's 2005 divorce decree constituted an event that triggered the involuntary withdrawal provisions. The trial court entered an order finding that the operating agreements were enforceable against Giacomantonio and granting Romagnoli and Penn summary judgment on that issue. Specifically, the trial court found that the operating agreements were valid and enforceable because Giacomantonio had put forth no evidence to support his claims for "fraud, negligent misrepresentation, breach of fiduciary duty, and conspiracy, all of which if found would void the contracts." At a subsequent hearing, the trial court clarified that its summary judgment order effectively disposed of Giacomantonio's tort claims, because that order found the operating agreements to be valid and enforceable and any claims Giacomantonio had against Romagnoli

and Penn would necessarily be based on those contracts.

In its summary judgment order, the trial court further found that the involuntary withdrawal provisions were intended to operate prospectively and therefore had not been triggered by Giacomantonio's earlier divorce decree. The court did not rule on whether any other event had occurred that would trigger the involuntary withdrawal provisions. Shortly before trial on that issue and on the question of what amount would be owed to Giacomantonio in the event of a buyout, the parties agreed to engage in the valuation process provided for in the operating agreements in the event of an involuntary withdrawal. The parties further stipulated that the trial court would retain the authority to determine whether the valuation process conformed to the operating agreements and whether the terms of any payout proposed by Romagnoli and Penn complied with those contracts. Additionally, Giacomantonio retained the right to have a bench trial on the issue of whether an involuntary withdrawal event had actually occurred.

The valuation process set forth in the operating agreements allowed each side to pick an appraiser to valuate Giacomantonio's interest in the LLCs. The contracts further provided that if the two appraisers could not agree, they could select a third, mutually agreed upon appraiser. After the two appraisers selected by the parties could not agree on either the valuation of Giacomantonio's interest or on the selection of a third appraiser, the trial court, at the parties' request, appointed a third appraiser. That appraiser was designated an officer of the court with the power to compel the production of documents and information from the parties. The third appraiser valued Giacomantonio's interest in the new LLCs at $429,893.71, which included the value of $59,763.81 in debts owed by Giacomantonio to the entities. Based on this appraiser's recommendation, the trial court entered an order of final judgment awarding Giacomantonio $370,129.90,[11] payable to him over ten years, which was the minimum term permitted by the operating agreements. Giacomantonio now appeals from that order and from that part of the trial court's summary judgment order which held that because the operating agreements were enforceable against Giacomantonio, his tort claims were barred.

1. In his first enumeration of error, Giacomantonio asserts that the trial court erred in denying his motion for injunctive relief and the appointment of a receiver. The injunctive relief requested would have granted Giacomantonio 50 percent of the voting rights in the

---

[11] This amount represented the $429,893.71 value of Giacomantonio's interest, less the debt he owed to the LLCs.

new LLCs, despite the terms of the operating agreements of those companies, which granted him only 47.5 percent of the voting rights in each entity. Giacomantonio, however, has not appealed the trial court's ruling that the operating agreements were valid and enforceable. His failure to do so renders moot the question of whether the trial court erred in denying the requested injunctive relief, given that such relief would have voided part of the operating agreements. In other words, given his concession that the operating agreements are valid, Giacomantonio is precluded from asserting that he is entitled to injunctive relief that would make part of those agreements invalid.

Additionally, Giacomantonio's brief concedes that the issue of whether a receiver should be appointed is relevant only if this Court reverses the order of final judgment entered by the trial court. As set forth below, however, we are affirming that judgment. Accordingly, we need not reach the question of whether the trial court erred in denying the receivership motion. *Clark v. State*[12] ("[t]he general rule is that if [a party] would receive no benefit by reversal of the case, [the issue] is moot") (punctuation omitted).

2. Giacomantonio next asserts that the trial court erred in holding that because the operating agreements were valid and enforceable, his tort claims for fraud and breach of fiduciary duty were barred. We disagree.

"In general, a party alleging fraudulent inducement to enter a contract has two options: (1) affirm the contract and sue for damages from the fraud or breach; or (2) promptly rescind the contract and sue in tort for fraud." (Punctuation omitted.) *Donchi*, supra, 283 Ga. App. at 163 (1). Here, Giacomantonio's complaint alleged, inter alia, fraud and breach of fiduciary duty, in addition to breach of contract. It did not, however, include a claim for rescission, and Giacomantonio has never pursued such a claim. Nor has Giacomantonio appealed from the trial court's finding that the operating agreements are valid and enforceable. "It is therefore apparent that [Giacomantonio] elected to affirm the [operating agreements] and seek damages arising from the alleged" torts and contractual breaches of Romagnoli and Penn. Id.

Significantly, the operating agreements each contained a merger clause. "[W]here [an] allegedly defrauded party affirms a contract which contains a merger or disclaimer provision and retains the benefits, he is estopped from asserting that he relied upon the other party's misrepresentation[s] [in entering the agreement] and his action for fraud must fail." (Punctuation omitted.) *Ekeledo v.*

---

[12] *Clark v. State*, 301 Ga. App. 354, 355 (687 SE2d 593) (2009).

*Amporful*.[13] In *Ekeledo*, the Supreme Court of Georgia indicated that this principle bars not only fraud claims based upon the alleged, pre-contract misrepresentations, but all tort claims based upon such misrepresentations, including claims for breach of fiduciary duty. Id. at 820 (2). See also *Ainsworth v. Perreault*[14] (one who elects to affirm an agreement which contains a merger clause "is precluded from recovering [damages] based on misrepresentations made outside the contract") (punctuation omitted). This is because "[i]n essence, a merger clause operates as a disclaimer of all representations not made on the face of the contract." *Ekeledo*, supra, 281 Ga. at 819 (1). See also *Ainsworth*, supra, 254 Ga. App. at 472 (1).

Here, Giacomantonio elected to affirm the contracts and accept the benefits thereof — benefits which included a 47.5 percent ownership in the three new LLCs, for which Giacomantonio paid no money. This affirmance necessarily included an affirmance of the merger clause found in each document. It therefore bars Giacomantonio from asserting a tort claim based upon any pre-contract representations that would contradict the contracts' written provisions, including his claims for fraud and breach of fiduciary duty.

3. Nor do we find any merit in Giacomantonio's argument that the trial court erred in allowing his damages award to be paid over a ten-year period, rather than in one lump sum.

At the pre-trial hearing at which the parties agreed to submit to the valuation process provided for in the operating agreements, the parties further stipulated:

> Once that valuation process . . . has been completed, the [new LLCs] will then propose how the amount due [Giacomantonio] will be paid *pursuant to the contract[s] [operating agreements]*. . . . [T]he [trial] Court will still be available to decide any issue with regard to the valuation process [including] whether the [proposed] terms of pay out . . . payment to [Giacomantonio] [is] *in compliance with the contract[s]*.

(Emphasis supplied.) The pay-out provisions in the operating agreements provided, in relevant part, that a member's withdrawal price could be paid by the companies giving that member a promissory note, with a minimum term of ten years and a maximum term of fifteen years. As this language demonstrates, a pay-out period of ten years was permissible under the terms of the operating agreements. Indeed, it represents the minimum term allowed by those agree-

---

[13] *Ekeledo v. Amporful*, 281 Ga. 817, 819 (1) (642 SE2d 20) (2007).

[14] *Ainsworth v. Perreault*, 254 Ga. App. 470, 472 (1) (563 SE2d 135) (2002).

ments. Having agreed to a pay-out pursuant to those contracts, Giacomantonio cannot argue on appeal that the trial court erred in refusing to violate the operating agreements and award him a lump sum payment. "[I]t is well established that one cannot complain of a judgment, order, or ruling that [his] own procedure or conduct procured or aided in causing, nor can [he] be heard to complain of or question on appeal a judgment which [he] invokes." (Punctuation omitted.) *Freese II, Inc. v. Moses*.[15]

For the reasons set forth above, we affirm the trial court's denial of Giacomantonio's motion for a temporary injunction or, alternatively, the appointment of a receiver; affirm the trial court's ruling that because the operating agreements were valid and enforceable, Giacomantonio's tort claims based on alleged, pre-contract misrepresentations were barred; and affirm the trial court's order of final judgment.

*Judgment affirmed. Barnes, P. J., and Senior Appellate Judge William LeRoy McMurray, Jr., concur.*

DECIDED SEPTEMBER 10, 2010.

*Taylor, English & Duma, John M. Gross, Ramsey A. Knowles*, for appellants.

*Carlton Fields, Walter H. Bush, Jr., Christopher B. Freeman*, for appellees.

---

[15] *Freese II, Inc. v. Moses*, 301 Ga. App. 793, 795 (689 SE2d 98) (2009).